# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2904-24

K.G.,[1]

    Plaintiff-Respondent,

v.

F.A.,

    Defendant-Appellant.

_____

> Argued May 5, 2026 – Decided July 13, 2026
>
> Before Judges Rose and Torregrossa-O'Connor.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FV-11-1856-24.
>
> Michael H. Nieschmidt argued the cause for appellant.
>
> Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to protect the identities of the parties. R. 1:38-3(d)(10).

Defendant F.A. appeals from an April 4, 2025 final restraining order (FRO) entered against him and in favor of plaintiff K.G. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant argues the trial court erroneously found plaintiff established a predicate act of stalking, N.J.S.A. 2C:12-10, and the need for future restraints under Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). He also asks this court to "revisit" our previous order denying his motion to strike as untimely under Rule 2:5-1(d) the trial court's amplified statement of reasons.[2] Following a review of the record and the applicable legal principles, we affirm.

---

[2] We preliminarily reject defendant's invitation to review and effectively reverse our September 5, 2025 order, denying his motion to strike the court's amplification as untimely pursuant to Rule 2:5-1(d), before filing his merits brief. K.G. v. F.A., No. A-2904-24 (App. Div. Sept. 15, 2025). In the same order, we granted defendant's request for an extension to file his merits brief. Ibid. Defendant did not move for reconsideration of the September 5, 2025 order.

Not only is defendant's claim improperly raised as a point in his merits brief, it lacks sufficient merit to warrant further discussion in a written opinion. See R. 2:11-3(e)(1)(E). We add only that we are satisfied no prejudice resulted from our order, which simultaneously extended defendant's time for filing his brief for one month, affording defendant a full opportunity to address the court's amplified findings.

I.

On May 22, 2024, then-eighteen-year-old plaintiff obtained a temporary restraining order (TRO) against defendant, forty-five years plaintiff's senior. Plaintiff's family rented space in defendant's two-bedroom apartment, where he also lived with his son. Plaintiff alleged predicate acts of stalking and harassment, stating on March 25, she "was taking a shower," when she noticed "a light from a camera that was placed in a basket where the household members place the shampoo, body wash, and other things." She reported that two days later she saw the camera again, this time removing it and calling the police, who advised her to wait to seek the TRO until they could confirm who was recording her. Plaintiff indicated "the camera recorded [her] showering." According to plaintiff, one week later, defendant approached her car, told her he had gone to her workplace to look for her, and asked to speak to her alone. Plaintiff expressed fear of defendant arising from the circumstances and his longstanding relationship with her family.

The FRO hearing took place over four separate days, beginning on June 27, 2024 and concluding with the court's oral decision on April 4, 2025. Plaintiff testified and presented testimony from Hightstown Police Detective Jerry

A-2904-24

Mecca, and provided photos of the shower area, and excerpts of the videos retrieved from the camera.

Plaintiff offered the following testimony. Plaintiff's family rented living space in defendant's two-bedroom home for roughly thirteen years. She shared one bedroom with her mother, father, and younger sister, while defendant and his son occupied the second bedroom. Common areas, including the kitchen, dining room, and single bathroom, were shared with defendant and his son. Plaintiff identified photos of the shower stall in the bathroom, which depicted a vertical stack of black corner baskets attached to a center pole. Each basket had holes for drainage, and plaintiff indicated several holes had been "made bigger and there were extra holes that did not belong there." The photographs reflected the enlarged and added holes as plaintiff described them.

Plaintiff first noticed the camera when in the bathroom to take a shower on March 25, 2024. The camera was located inside one of the baskets she described as "cubbies." She saw a blue flashing light coming from the camera. "[F]reaked out," plaintiff went to her room, where she heard defendant—"the only other person in the house at the time"—"go into the bathroom." After twenty minutes, plaintiff returned to the bathroom but the camera was missing. She described feeling "very scared," "shocked," and unsure "what to do."

A-2904-24

Two days later, plaintiff entered the bathroom and ran the water to "make noise" while she looked for the camera, which she found on the left side of the same "cubby." The camera was covered by a dark cloth, but she believed it was recording "because the lights were also still on." This time she took the camera, left the house, showed it to her mother, and they called the police. She turned the camera over to the police who commenced a criminal investigation. Plaintiff noted hearing defendant leave the house when she took the camera from the bathroom.

On April 4, plaintiff returned to the apartment from work. Defendant "parked right next to [her] in the parking lot" of the apartment, "knocked on the window," and "kept insisting [they] needed to talk," but she did not know why. Defendant told her he had attempted to find her at her workplace. Plaintiff refused to engage because she "was just scared" and had known defendant since she was very young and "saw him as a father figure because [she's] not that close with [her] father." Plaintiff's parents were in the throes of a divorce, and plaintiff, her mother, and her sister moved out of defendant's home with the entry of the TRO at the end of May 2024.

Plaintiff had not seen defendant since that time and was uncertain whether her father still lived there. Plaintiff explained she feared defendant because he

knew so much about her, including places she frequented, where her family lived, where she attended college, and where she worked. She expressed concern because he went to her workplace on April 4 to try to find her, they all lived in a "small town" and, at the time of trial, she was living only "five minutes by car" from his apartment.

Mecca testified that he inspected the camera and retrieved its memory card pursuant to a search warrant issued in the related criminal investigation. The detective reviewed the data, which included relevant videos from March 25 and 27, 2024, including one depicting an individual identified as defendant holding a cellular phone and placing the camera in the shower area. The corresponding video excerpts were played and admitted into evidence. Mecca testified he reviewed other relevant footage, including videos depicting plaintiff, and described the camera's Wi-Fi or Bluetooth capabilities allowing it to connect to a mobile device to watch a live video feed.

Mecca also recounted his subsequent custodial interrogation of defendant in the criminal matter. In his statement, defendant admitted he purchased the camera and placed it in the shower, specifically desiring a picture of plaintiff. The detective testified defendant told him the camera connected to "live feed."

6

A-2904-24

On April 4, 2025, the trial court entered the FRO against defendant, finding plaintiff, although not proving harassment, had established the predicate act of stalking and the need for permanent restraints. The court found plaintiff's testimony "very credible," with no motivation to falsely implicate defendant. The court described plaintiff as appearing "obviously physically and honestly shaken up and tearful and crying about what happened to her." The court similarly credited Mecca as "credible and knowledgeable," noting he confirmed a Bluetooth connection on the camera "and that as a result concluded there was a live feed on defendant's phone" based on defendant's admission.

After determining the record had not established harassment, and citing the applicable law related to stalking, the court determined defendant engaged in a purposeful and knowing course of conduct directed at plaintiff that caused her to experience emotional distress. The court reasoned on March 25 and March 27, 2024, defendant placed the camera in the "shared bathroom shower that was connected to his phone, so that he could view the plaintiff while showering and in a state of undress." The court noted the camera contained recordings of plaintiff, and defendant admitted "the device was his and he wanted to obtain images of plaintiff."

A-2904-24

According to the court, defendant engaged in a course of conduct that would cause a reasonable person to either "fear for his or her safety" or "suffer emotional distress." Noting plaintiff was "a young woman" who "grew up thinking of defendant as a surrogate father who she trusted," the court found plaintiff

> very clearly distressed to the core that she has suffered deep emotional distress arising out of the fact defendant broke her trust, targeted her in an attempt, without her knowledge, to take those videos of her while she was in the safety of their long-shared home behind closed doors in the bathroom without her knowledge, taking lewd pictures of her or attempting to view her naked in the shower.

Turning to the need for future protection, the court recognized the PDVA "is to be liberally construed to provide maximum protection that individuals who suffer domestic violence can get under the law," the court addressed the statutory factors under N.J.S.A. 2C:25-29(a)[3] and found "an FRO [wa]s necessary to

---

[3] These factors include, but are not limited to:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;

protect plaintiff's best interest." The court found plaintiff remained "emotionally distraught" and "devastated," and lived in close proximity to defendant who knew details concerning her and her family's lives, particularly as plaintiff's father continued to live with defendant. Therefore, the court determined "the best interest analysis . . . weigh[ed] very, very, very, heavily in favor of plaintiff."

Dispelling defendant's argument that an FRO was "not necessary because the parties no longer live[d] together," the court emphasized the PDVA's

---

(3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety;

(6) The existence of a verifiable order of protection from another jurisdiction; and

(7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity or human rights with the court specifically considering evidence of the need for protection from immediate danger or the prevention of further abuse. . . .

[N.J.S.A. 2C:25-29(a).]

9

A-2904-24

recognition "the compulsions of stalkers may turn more dangerous, and it is broadly intended to protect victims before the plaintiff is put further in . . . danger." The court held an FRO was necessary to protect plaintiff, especially considering defendant "as an adult who enjoyed a father-like relationship with plaintiff, could not stop himself from trying to obtain images of her naked and in intimate situations in the bathroom." Noting the parties' continued close proximity at the time of trial, the court concluded an FRO was necessary to prevent defendant "from starting to surveil [plaintiff] again." Following issuance of the April 4, 2025 FRO, this appeal followed.

On August 19, 2025, the trial court issued a nine-page amplification, which reiterated and expanded on the earlier oral findings. The court emphasized defendant's admissions he "owned the camera," wanted to capture images of plaintiff with it, and that he placed the camera in the shower. Thus, the court clarified, regardless of whether defendant viewed the recordings of plaintiff, the acts of installing the camera in the bathroom on two separate occasions constituted a course of conduct because defendant "indirectly placed himself in visual proximity to plaintiff" with the assistance of technology. The court also found the record supported a finding defendant's phone was connected to the camera allowing him to watch a live feed.

A-2904-24

Regarding the need for an FRO, the court expanded upon the purposes behind the PDVA and anti-stalking statute. The court noted defendant's "impulsive, covert, and invasive behavior despite the parties' family-like relationship, his reliance on technology to advance his compulsion, and the parties' physical proximity," demonstrated an FRO was necessary to protect plaintiff.

## II.

On appeal, defendant argues the trial court erred in finding plaintiff established the predicate act of stalking, claiming the record did not show: defendant was the individual depicted in the videos setting up the camera; defendant received live feed on his phone; the camera captured footage of plaintiff; or plaintiff was the target of the recordings. Citing no caselaw for the proposition, defendant further argues "attempts" to stalk do not constitute separate acts under the stalking statute, N.J.S.A. 2C:12-10(a)(1). He also contends the trial court erroneously found plaintiff proved an FRO was needed for her future protection.

An appellate court's review of an FRO determination is generally limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic

violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)); see also S.K. v. J.H., 426 N.J. Super. 230, 238 (App. Div. 2012). The appellate court may review the FRO record to determine whether the record as a whole supports issuance of the FRO. See J.D., 207 N.J. at 488. Findings by a court "are binding on appeal when supported by adequate, substantial, credible evidence." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare v. Cesare, 154 N.J. 394, 411 (1998)). Our review of legal conclusions is de novo. See C.C., 463 N.J. Super. at 428-29.

When determining whether to issue an FRO pursuant to the PDVA, trial courts must engage in a two-step analysis. See Silver, 387 N.J. Super. at 125-27. The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Upon a finding of a predicate act of domestic violence, the court must then determine whether an FRO is required to protect the party seeking restraints from future acts or threats of violence. Id. at 126-27. "[T]here [must] be a finding that 'relief is necessary to prevent further abuse.'" J.D., 207 N.J. at 476 (quoting N.J.S.A. 2C:25-29(b)).

We first address defendant's challenge to the court's finding defendant committed the predicate act of stalking. N.J.S.A. 2C:12-10(b) provides "[a] person is guilty of stalking . . . if he [or she] purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his [or her] safety or the safety of a third person or suffer emotional distress." The statute defines "course of conduct" as

> repeatedly maintaining a visual or physical proximity to a person; directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about, a person, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or toward a person.
>
> [N.J.S.A. 2C:12-10(a)(1).]

Notably, "the [stalking] statute's course-of-conduct focus[es] . . . on the accused's conduct and what that conduct would cause a reasonable victim to feel, not on what the accused intended." State v. Gandhi, 201 N.J. 161, 170 (2010). The statute further defines "[r]epeatedly" as "on two or more occasions"; "[e]motional distress" as "significant mental suffering or distress"; and "[c]ause a reasonable person to fear" as "to cause fear in which a reasonable

13

victim, similarly situated, would have under the circumstances." N.J.S.A. 2C:12-10(a)(2)-(4).

H.E.S. v. J.C.S., 175 N.J. 309 (2003), is instructive here. There, the defendant hid a camera and microphone in his wife's bedroom and monitored her for an unknown period of time. Id. at 317. Our Supreme Court held the defendant's conduct could constitute stalking because it was "reasonable to infer that [the] defendant [wa]s responsible for installing the surveillance equipment and that he acted 'purposefully or knowingly' against a 'specific person,' his wife." Id. at 329. Additionally, the Court stated the defendant's behavior could "constitute a 'course of conduct' because he repeatedly . . . maintain[ed] a visual . . . proximity to" the plaintiff. Id. at 329-30 (second omission in original) (quoting N.J.S.A. 2C:12-10(a)(1) and (2)).

We perceive no misuse of discretion in the court's finding defendant engaged in stalking, given the ample evidence in the record. After making detailed credibility findings, the trial court reasonably concluded defendant purposefully and knowingly engaged in a course of conduct directed at "a specific person"—plaintiff—which "would cause a reasonable person to fear for his or her safety . . . or suffer other emotional distress."

14

Although the bathroom was a common area utilized by all residents in the dwelling, the record amply supports the court's finding that defendant, who admitted he purchased and placed the camera in the bathroom and wished to film or photograph plaintiff, hid the camera repeatedly with purpose to monitor and view an unwitting plaintiff. Plaintiff's testimony concerning defendant's location in the home on March 25 and 27, 2024, and the secretive placement of the camera in the basket with strategically enlarged holes, together with Mecca's testimony about defendant's admissions and the data retrieved from defendant's phone, including the videos extracted from it, sufficiently anchored the court's conclusion defendant engaged in a course of conduct targeting plaintiff.

We are similarly convinced the trial court did not err in finding defendant purposely set up his camera to provide live feed to his phone. Mecca testified the camera had Bluetooth capabilities, and the videos showed defendant "manipulating his phone near his stashed camera to ensure it was connected." According to Mecca, defendant told him the camera had "live feed," and the detective found images of plaintiff on the device. The trial court also credited plaintiff's testimony defendant "quickly fled the home," when she seized the camera, suggesting to the court defendant was viewing plaintiff as she retrieved the camera, which displayed a flashing light. Regardless of whether defendant

succeeded in viewing the livestream on March 27 when plaintiff thwarted his surveillance, we are satisfied the record supported a finding defendant "monitored" and "surveilled" plaintiff within the meaning of the stalking statute. His setting up his camera to prepare for plaintiff's use of the bathroom that day constituted the requisite "proximity" to and "monitoring" of plaintiff under the law.

That plaintiff suffered emotional distress is readily evident in her testimony and the circumstances involving defendant's profound breach of plaintiff's trust and invasion of her privacy. We are likewise satisfied defendant's actions in surveilling a barely eighteen-year-old girl who resided in his home would evoke fear in a reasonable person and caused plaintiff emotional distress. Accordingly, the court properly concluded plaintiff established the predicate act of stalking.

We are also unpersuaded the trial court erred in finding permanent restraints were necessary for plaintiff's protection. The record amply supports the trial court's entry of future restraints to prevent future harm. Defendant, a trusted lifelong "father figure," went to great lengths to surreptitiously monitor plaintiff while in the bathroom, vulnerable, exposed, and showering. Defendant

16

engaged in this alarming conduct even though his son and plaintiff's family lived in the home.

At the time of trial, plaintiff resided near defendant, causing her to reasonably fear defendant would contact her. In particular, defendant appeared at her workplace and then confronted her at home attempting to meet her alone, presumably understanding she uncovered his surveillance activity and seized his camera. Plaintiff expressed reasonable concern defendant knew her whereabouts and places she and her family frequented. Defendant's refraining from contacting plaintiff from the entry of the TRO and during the pending police investigation does not, as he suggests, undermine a reasonable concern of future risk to plaintiff. Thus, we are satisfied the trial court correctly found plaintiff's interests and need for protection necessitated the FRO.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2904-24